UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHARLES L. BYE, JR. and BYE
INSURANCE AND FINANCIAL
SERVICES, INC.,

        Plaintiffs,

                                        Case No. 08-10824

v.

                                        Paul D. Borman
                                        United States District Judge


NATIONWIDE MUTUAL INSURANCE
COMPANY, an Ohio Corporation,

        Defendant.
_____/


OPINION AND ORDER
(1) GRANTING DEFENDANT NATIONWIDE MUTUAL INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT AS TO COUNTS I, II, IV AND V OF PLAINTIFFS'
COMPLAINT;
(2) REQUESTING REBRIEFING ON COUNT III (BREACH OF CONTRACT) BY AUGUST
19, 2010 (UP TO 7 PAGES); AND
(3) HOLDING IN ABEYANCE THE COURT'S RULING ON NATIONWIDE'S MOTION
FOR SUMMARY JUDGMENT ON COUNTS I-V OF ITS COUNTERCLAIM

       This matter is before the Court on Defendant Nationwide Mutual Insurance Company's

("Nationwide") Motion for Summary Judgment.  (Dkt. No. 60.)  Plaintiffs filed a Response (Dkt.

No. 66) and Nationwide filed a Reply (Dkt. No. 69.)  The Court held a hearing on July 28, 2010.

For the reasons that follow, the Court GRANTS Nationwide's motion on Counts I, II, IV and V of

Plaintiffs' Complaint, requests the parties to submit supplemental briefing on Count III of Plaintiffs'

Complaint and holds in abeyance its ruling on Nationwide's motion for summary judgment on Counts I-V of its Counterclaim.

## I.     BACKGROUND

### A.     The History of Plaintiff's Tenure With Nationwide

Charles L. Bye, Jr. ("Plaintiff") worked for nine years as an insurance agent for Defendant Nationwide.  In June, 1998, Plaintiff read an article describing a business opportunity with Nationwide and he contacted Nationwide about the position.  (Def.'s Mot. Ex. 1, Deposition of Charles Bye Jr., June 18, 2009, 53.)  Bye had previously worked as a sales manager for Pitney Bowes, a store manager for Zale Jewelers and had owned his own jewelry business, Hillcrest.  (*Id.* 42-48, 50-52.) Thus, Plaintiff had experience supervising staffs, hiring and firing employees, and controlling expenses, budgeting and marketing.  (*Id*. 48.)

On June 3, 1998, Nationwide offered Plaintiff the position of Financed Community Agent ("FCA") at a salary of $65,000 per year, contingent on Plaintiff passing a number of employment screens and completing certain training and licensing programs.  (Def.'s Mot. Ex. 2.)  On June 29, 1998, Plaintiff signed an FCA Agreement under which Nationwide placed Plaintiff in an agency location, paid his salary and bonuses and paid over $200,000 per year to cover his expenses, including office lease, furnishings, utilities and marketing expenses while Plaintiff continued to learn the business of selling insurance.  (Def.'s Mot. Ex. 1, Bye Dep. 66, 69, 54-55; Def.'s Mot. Ex. 3.) In this agreement, Plaintiff agreed that Nationwide could increase its premiums without any prior notice to Plaintiff and could eliminate lines of business or stop writing insurance in Michigan altogether, without notice to or consent from Plaintiff.  (Def.'s Mot. Ex. 1, Bye Dep. 69.)  Plaintiff understood that Nationwide was a mutual insurance company, owned by its policyholders, and that

Nationwide would act under this provision, and even leave an entire market without notice to its agents, if it was in the best interests of its policyholders to do so. (*Id*. at 72.) Plaintiff acknowledges that he understood and agreed to this provision, but he "assumed" that Nationwide, would not ever let its agents "go bankrupt" because "that's not the right thing to do." (*Id*. 69, 70-71, 73.) Plaintiff acknowledged, however, that there was never an agreement or writing between himself and Nationwide in which Nationwide made any such agreement not "to pull the carpet up from under [him]." (*Id*. at 74.)

After four years in the FCA program, Plaintiff became an Independent Contractor Agent ("ICA") with Nationwide and executed an Independent Contractor Agent's Agreement ("ICA Agreement") on May 2, 2002. (Def.'s Mot. Ex. 1, Bye Dep. 56, 83; Def.'s Mot. Ex. 4.) Like the FCA Agreement, the ICA Agreement contained a provision which authorized Nationwide to change prices, terms and to discontinue entirely writing or accepting policies or lines of insurance without notice to our consent of its agents and again Plaintiff indicated that he read and agreed to this provision at the time he signed the ICA. (Def.'s Mot. Ex. 1, Bye Dep. 84-85.)

A few months after becoming an ICA, Plaintiff, assisted by counsel, chose to begin to operate as a corporation and entered into a Corporate Agency Agreement ("CA Agreement") with Nationwide. (*Id*. at 87; Def.'s Mot. Ex. 5.) This agreement, like the FCA and the ICA, contained a provision which allowed Nationwide to make business decisions regarding premium pricing and underwriting decisions entirely independent of and without any notice to its agents and Plaintiff testified that he read and agreed to this language "for the third time." (Def.'s Mot. Ex. 1, Bye Dep. 103.) Plaintiff understood that the objective of the CA was that he have a profitable agency but also that Nationwide run a profitable business. (*Id*. at 91.)

Soon after becoming an ICA, Plaintiff began to expand and grow his business either by acquiring existing agencies or opening new satellite offices. Plaintiff set his sights on an existing Nationwide agency in Okemos, Michigan and was given a six-month "free look" period (as he was with all of his acquisitions) where he could work the book of business and decide whether he wanted to proceed with a formal acquisition. (*Id*. at 113-114, 119-120.) In December, 2002, Plaintiff took out a loan from Nationwide in the amount of $27,526.39 to purchase the Okemos agency.[1] (*Id*. at 58-59, 116-117; Def.'s Mot. Ex. 6.) Plaintiff testified that he decided to acquire the Okemos agency in spite of the fact that two agents had failed there before him and despite Nationwide's expressed fear about another agent failing there as well. (Def.'s Mot. Ex. 1, Bye Dep. 59.)

In spite of the fact that two other agents in Okemos had "failed miserably" and "couldn't write enough business to survive," Plaintiff felt he could succeed because he was "not like those other guys" and had a "better work ethic." (*Id*. at 113.) Plaintiff felt that he could succeed where the other agents had failed "because some people just weren't cut out to do it," and so he proceeded with the loan and purchase of the Okemos agency. (*Id*.) Plaintiff believed at the time that this was a good business decision and does not believe that Nationwide had "an undisclosed plan to push [him] out of the business" when he acquired the Okemos agency. (*Id*. at 60-61.)

In late 2003 or early 2004, Plaintiff decided to further expand and decided to participate in Nationwide's Capital Access Program ("CAP Loan Program") to fund a new satellite office in DeWitt, Michigan and hire new staff. (*Id*. at 130-131.) Under the CAP Program, Plaintiff had an opportunity to secure a loan through Nationwide's financing arm and to have repayment of the loan

---

[1] Plaintiff also executed, in connection with the Okemos loan, a separate loan in the amount of $13,101 for "growth services" with performance requirements pursuant to a Growth/Growth Plus Agreement. (Pls.'s Resp. Ex. H.)

waived if Plaintiff grew his agency by one-and-a-half times the "state DWP [direct written premium] growth objective," a goal that Plaintiff believed he could achieve in this instance because he was going to "double [his] number of producers." (*Id*. at 127-128, 148-149; 173.) The CAP Program, with the potential for loan forgiveness and interest on the loan at prime plus one, was an option for financing and was a benefit of being a Nationwide exclusive agent. (Pl.s's Resp. Ex. A-2, Deposition of Michael Whitehead, March 13, 2009, 65-66, 83.) An agent who chose not to participate in the CAP Loan program and who needed to finance to expand his or her business would have to seek financing from a traditional bank, at a higher interest rate, and with no potential for ultimate loan forgiveness. (*Id*.)

Nationwide provided the state growth target for the pro forma.[2] (Pls.'s Resp. Ex. D-1, Deposition of Ranelle Smith, June 29, 2009, 12.) From approximately 2004 to 2009, state target goals were higher on average than actual state growth. (*Id*. at 15; Pls.'s Resp. Ex. M.) This historical data is available to agents online. (Pls.'s Resp. Ex. D-1, 26.) Plaintiff testified that at the time he opted to participate in the CAP Loan program, he thought that the figure in the pro forma

---

[2] In fact the state growth target is achieved by first determining the Regional Vice President's annual growth objective which is calculated "by looking at prior growth figures and the potential for future growth in the region." (Pls.'s Resp. Ex. K, Def.'s Amended Responses to Plaintiff's First Set of Interrogatories, Interrogatory No. 3©, p. 4.) Adjustments to this calculation are made by senior company management "for the purpose of bringing the various regions' growth goals in line with overall company growth goals." (*Id*.) The Regional Vice President and other regional management then "assign their overall regional growth goal to the states within their region based on rate activity, terminations, new writings, distributions programs and economic conditions." (*Id*.) From this preliminary state growth goal are subtracted premium goals for products that exclusive agents do not write and added to this figure are premium goals for products that the exclusive agents do write but that are not within the Regional Vice President's objectives. The net result is a statewide growth goal. "Many factors" went into determining the state growth objectives including price points, loss history, economic conditions and the process involved actuarial, pricing and product team members. (Pls.'s Resp. Ex. F, Deposition of Karen Marszelac, June 12, 2009, 24-25.)

representing the "state growth objective" was an "actual" number and not a "target." (Def.'s Mot. Ex. 1, Bye Dep. 173-174.) Plaintiff admitted that the word "actual" never appeared in the formula and testified that he had seen the term "state growth objectives" for the company in the past, and understood it to represent a "goal" or a "corporate objective." (*Id.* at 174-176.)

Plaintiff worked with Joe Sheffieck, a Nationwide business consultant, to complete a CAP Loan application and pro forma for the planned expansion. Nationwide business consultants can be called in to assist with preparation of a pro forma but there is no requirement that an agent utilize a Nationwide business consultant. (Pls.'s Resp. Ex. D-1, Smith Dep. 19.) According to Ms. Smith, up until 2005 the business consultants fulfilled the obligations set forth by the company but in 2005, when the business consultants began reporting to the regions, in her opinion the business consultants became too closely aligned with the sales department. (*Id.* at 21-22.) Ms. Smith opined that this never resulted in a lack of service to the agents but that in her opinion the consultants were perhaps not as objective as a third-party consultant would be. (*Id.* at 23.)

The pro forma was a collaborative effort between the agent and the business consultant. (Def.'s Mot. Ex. 1, Bye Dep. 126-141, 143; Def.'s Mot. Ex. 7, pp. 10-40.) The business consultant prepared the pro forma with input from the agent, asking the agent to provide expected expenses, anticipated sales and premium assumptions. (Pls.'s Resp. Ex. C-1, Deposition of Joseph Sheffieck in the matter of *Boeve v. Nationwide*, 08-12213, May 8, 2009, 10-11.)[3] The premium assumptions

---

[3] Mr. Sheffieck's testimony cited by Plaintiff in this case was given in depositions taken in a different case currently pending in this District, *Boeve v. Nationwide*, No. 08-CV-12213. The *Boeve* case is one of two other cases against Nationwide currently pending in this District from which Plaintiff offers testimony in this case. The other case is *Nemier v. Nationwide*, 09-CV-10634. Where the cited testimony is from proceedings in one of these other cases, the Court so indicates. The Court notes that on April 9, 2009, in a fourth case currently pending against Nationwide in this district, *Bucciarelli v. Nationwide*, No. 08-CV-14349, Judge Murphy denied a motion to consolidate

were not provided by Nationwide but were based on input from the agent and were a "best guess" as to where the business consultant and the agent thought the premiums might go. (*Id*. at 22-23.) "The consultant and the agent work together [to arrive at the premium rate assumptions.] They look at historically what has happened . . . and what the agent believes is likely to happen in their market." (Pls.'s Resp. Ex. D-1, Smith Dep., 11-12.) An agent was expected to complete the pro forma "and then compare it to the state targets to see if they should take out a cap loan." (*Id*. at 14.)

   With respect to Plaintiff's pro forma , the information provided by Plaintiff indicated that his agency had experienced recent premium rate increases (indeed this was part of his justification for the staff increase) and the information provided by Mr. Sheffieck indicated that rates were going to continue to increase 22 percent over the next three years. (Def.'s Mot. Ex. 1, Bye Dep. 149-152.) Although Plaintiff read and understood this projected rate increase, he testified that he didn't "expect" it would really happen. (*Id*. at 151.) Premium rate prices were a factor affecting Plaintiff's ability to sell insurance.[4] Plaintiff was anxious to close the loan in spite of these predictions because

---

his case with the instant case and the *Boeve* case, finding that the cases "arise out of separate transactions and occurrences" and "will require an entirely separate set of trial evidence." (No. 08-CV-14349, Opinion and Order Denying Motion for Consolidation, Dkt. No. 25, p.2.) Judge Murphy concluded that the "factual variations between the various cases [are] too great to justify whatever marginal efficiency gains might result from consolidation for this purpose." *Id*. This Court concurs with Judge Murphy's conclusion that these cases arise from separate an distinct factual scenarios and, while taking judicial notice of the cited testimony from these unrelated cases, does so with caution, recognizing that the testimony was given in a wholly unrelated factual context.

[4] Although Plaintiff states in his response that "[p]rice is and was the most important thing to a customer when he or she chooses where to buy auto and homeowners insurance," the testimony cited in support of this statement states only that price is "a" factor, not that it is the most important factor. (Pls.'s Resp., Ex. A-1, Whitehead Dep.60 (price "plays a role, it is not in my opinion the absolute most important factor in making a purchase decision from a client's perspective, it's not the most important thing an individual looks at when purchasing insurance"); Pls.'s Resp. Ex. B, Deposition

his agency was "in a growth mode," (although operating at the time at a loss) and on February 10, 2004, Plaintiff entered into a Credit Agreement and Promissory Note with Nationwide Bank for $125,000. (*Id*. at 176-178; Def.'s Mot. Ex. 7, pp. 8-9.) Plaintiff also executed, in connection with his CAP Loan application, a CAP Performance Agreement ("Performance Agreement"), which specified exactly the growth that Plaintiff had to achieve in order to obtain waiver of his loan. (Def.'s Mot. Ex. 8.) Plaintiff signed this Performance Agreement and specifically acknowledged that he read and understood the Loan Waiver provisions, initialing a separate acknowledgment. (*Id*. at p. 4.)

In November, 2004, Plaintiff sought to expand his agency yet again by acquiring the Cambridge Insurance Agency which was an independent agency Plaintiff hoped to consolidate with his DeWitt satellite agency. (Def.'s Mot. Ex. 1, Bye Dep. 131-132.) In order to obtain funding to help with the Cambridge acquisition, Plaintiff prepared a business plan, indicating in the plan that Nationwide had "fairly competitive auto rates" in the relevant geographic area based upon a "competitive sampling" performed by Plaintiff. (*Id*. at 178-180; Def.'s Mot. Ex. 9.) Nationwide also helped Plaintiff prepare a business plan/pro forma which indicated on its cover page:

> With your cooperation your business advisor has developed this plan. It is our strong mutual desire that by following this plan, it will help you profitably grow your agency. However, it is important for you to recognize that the implementation of this plan is entirely optional and solely your responsibility. Nationwide cannot and does not guarantee the plan as outlined will result in achieving the desired objectives.

(Pls.'s Resp. Ex. I.). On December 2, 2004, Plaintiff executed a Credit Agreement and Promissory Note with Nationwide which was supported by a cash flow analysis of the Cambridge agency and

---

of Bryan Van Epps (in the matter of *Boeve v. Nationwide*, No. 08-12213), March 19, 2009, 35 (price is "important, and I would not say it's exclusively what makes or breaks a sale"); Ex. D-1, Deposition of Ranelle Smith, June 29, 2009, 28 ("In parts of Michigan, price is very important.").)

an Asset Purchase agreement, the latter having been prepared by Plaintiff's independent counsel in connection with the Cambridge purchase. (Def.'s Mot. Ex. 10; Def.'s Mot. Ex. 1, Bye Dep. 188-190.) Nationwide was not involved in setting the price that Plaintiff agreed to pay for the Cambridge property. (Def.'s Mot. Ex. 1, Bye Dep. 190-192.) Following the Cambridge acquisition, Plaintiff was perhaps losing money but was "pretty close to break even." (*Id.* at 193-194.)[5]

Sometime *prior* to his acquisition of the Cambridge agency, Plaintiff became aware that Nationwide's affiliate, Allied Insurance Company ("Allied"), was selling the Nationwide product in competition with Nationwide's exclusive agents, like Plaintiff. (*Id*. at 62-63.) In fact, Plaintiff complained to Nationwide because it was Plaintiff's perception that Allied was selling the same product as the Nationwide exclusive agents but at a lower price. (*Id*. at 63.) Plaintiff testified that Nationwide never attempted to conceal the fact that Allied was operating in Michigan and in fact indicated to Plaintiff that the Allied competition was "just the way it [was]." (*Id*.)

In late 2005, although rates were rising, and although Plaintiff's debt load continued to grow and Plaintiff had complained about competition from Allied, Plaintiff decided to expand again and to take out another loan from Nationwide to purchase an existing agency in Holt, Michigan, which, like Cambridge, previously had been run by an agent who had struggled financially. (*Id*. at 194-196.) Plaintiff testified that he chose to continue to expand because "growth was King at Nationwide." (*Id*. at 195.) Plaintiff testified that no one at Nationwide forced him to take over Holt but that he felt it was important to grow to "stay in [Nationwide's] good graces." (*Id.* at 195-196.) In spite of this perceived pressure to grow, Plaintiff understood that any acquisition had to make

---

[5] Plaintiff also signed another Growth Services Loan on April 25, 2007 for $10,000. (Pls.'s Resp. Ex. J.)

financial sense for his own business. (*Id*. at 196.) Plaintiff felt the Holt acquisition was financially sound because the Holt agency "provid[ed] positive cash flow." (*Id.*) Plaintiff prepared his own forecast numbers for the Holt merger and tried to set "a realistic growth number for Nationwide." (Def.'s Mot. Ex. 11; Def.'s Mot. Ex. 1, Bye Dep. 201-202.) Plaintiff indicated to Nationwide that he "looked forward to the challenge" of the Holt agency and on June 2, 2006, he signed yet another Credit Agreement and Promissory Note with Nationwide in the amount of $85,589.77 for the acquisition of the Holt agency. (Def.'s Mot. Ex. 14; Def.'s Mot. Ex. 1, Bye Dep. 206.) Plaintiff also executed a Policy Assignment and Service Agreement which set forth the loan waiver requirements for the Holt loan. (Def.'s Mot. Ex. 12.) As with Okemos, Plaintiff was given a six-month "free look" period, during which time he could have backed out of the deal and the loan completely. (Def.'s Mot. Ex. 1, Bye Dep. 207-208; Pls.'s Resp. Ex. A-2, Whitehead Dep. 84.)

Plaintiff testified that at the end of 2006, having taken out three loans for expansions of his business, he still was operating at a loss. (Def.'s Mot. Ex. 1, Bye Dep. 212.) "Things had gotten progressively worse [since the end of 2004] because they had taken two or three more rate increases." (*Id*.) Plaintiff admitted that these rate increases had in fact been assumed by the pro formas and business plans. (*Id*.)

It was "early in 2007 when [Plaintiff] started getting concerned." (*Id*.) Plaintiff and his wife decided that she should open an insurance business and in November, 2006, she opened (Counter-Defendant) Bye Financial Group, LLC. (*Id*. at 213-214.) Plaintiff helped to set up the company and Plaintiff's wife, although she had worked at an insurance company as a Network Operations manager, was never involved with the insurance products side of the business and was not and is not licensed to sell insurance. (*Id*. at 213; Def.'s Mot. Ex. 13, Deposition of Kay Bye, June 18, 2009,

7, 9-10, 11.)

Plaintiff's wife testified that opening the LLC was her husband's idea but she thought it was a "great" idea and it gave her "an opportunity to help with [their] future together." (Def.'s Mot. Ex. 13, Kay Bye Dep. 10.) Plaintiff's wife indicated that she was a member of the LLC because "it would [have been] inappropriate based on [her] husband's employment with Nationwide to start another company on his own. So [she] became the principal for Bye Financial Group." (*Id*. at 10-11.) The LLC shared office space and office equipment with Plaintiff's Nationwide agency. (Def.'s Mot. Ex. 1, Bye Dep. 215-217.) Nationwide believed that Plaintiff began referring potential and existing Nationwide customers to the LLC and terminated Plaintiff's agency on May 22, 2007 for breach of his agreement to exclusively represent Nationwide. The termination became final on June 7, 2008 when the Agent Review Board denied Plaintiff's appeal. (*Id*. at 233 - 236.)

### B.     The Alleged Company-Wide Failure of Agents to Achieve Loan Waiver

Plaintiff asserts that his experience in failing to achieve loan waiver was common among Nationwide agents and presents evidence which he argues indicates that only a small percentage of the CAP Loans nationwide achieved full waiver. (Pls.'s Resp. 13; Ex. M.) Ms. Smith testified that the CAP Loan program was designed to provide a benefit to the agent but that an agent also was free to either take a CAP Loan or to go to their personal bank for financing. (Pls.'s Resp. Ex. D-1, Smith Dep. 41.) Ms. Smith could recall approximately ten agents who had achieved loan waiver. (*Id*. at 16-17.) The business consultants were trained to help the agent take a look at economic conditions and the market and determine whether their cash flow would support their goals and desires for growth. (Pls.'s Resp. Ex. D-2, Smith Dep. 72-73.) In theory, if the agent worked together with the business consultant when putting together the pro forma, taking into consideration the historical data

in their market, and if the agent implemented what he or she indicated in the pro forma they were going to do, they should have been able to achieve the goals of the pro forma. (Pls.'s Resp. Ex. D-1, Smith Dep. 13.)

However, according to Ms. Smith, the CAP Loan program hit Michigan at a time when the Michigan economy was going down which frustrated Nationwide's initiatives, like the CAP Loan program, which Nationwide was hoping would increase sales and spark growth in Michigan. (Pls.'s Resp. Ex. D-2 at 46.) Ms. Smith testified that the experience of the success of the CAP Loan program correlated directly with the negative growth in the insurance industry as a whole. (*Id*. at 42.) "The waivers followed that trend so the peak of full waivers hit in about the year 2002. And then, as the industry as a whole started to shrink, there was less for all agents to write and hence, the waivers decreased right along with the national trends." (*Id*.) Additionally, Ms. Smith testified that within Nationwide, there was some "misinformation" about the way the CAP Loan program was supposed to work and stated that several agents in Michigan expressed to her their regret for having undertaken the CAP Loan program because loan waiver was a goal they were never able to achieve. (*Id*. at 46.)[6]

---

[6] Plaintiff mischaracterizes Ms. Smith's testimony in this regard, stating that Ms. Smith testified that there had been "misrepresentations" by the sales team and business consultants. This was not Ms. Smith's testimony. Ms. Smith testified that there was a "lack of understanding" on the part of the sales team about how the CAP Loan program worked and that consequently "misinformation" was frustrating the success of the program. (Pls.'s Resp. Ex. E-3, Smith Dep. 118 (there is no indication in which case this deposition was taken).) Moreover, it appears that this testimony was given in a different case, with respect to a different agent, and although Ms. Smith made some generalizations, she also was speaking about the pro forma and business plan issues that confronted the plaintiff in that case, not Mr. Bye. (*Id*. at 119.) This Court has no idea of the prior business experience of a plaintiff in another case; the Court is well aware of Plaintiff Bye's extensive prior business experience, both pre-Nationwide and during his continuous experience over the years with Nationwide as he purchased agency after agency.

Ms. Smith began to have concerns in September, 2004, that the agents were having trouble achieving waiver on their CAP Loans. (Pls.'s Resp. Ex. E-1, Smith Dep. 20 (taken in *Nemier v. Nationwide*).) Ms. Smith was of the opinion that the pro formas should not utilize *target* state growth, which for the approximate years 2004-2009 had been twice the actual state growth, but should utilize *actual* state growth, which Ms. Smith testified would result in many more agents achieving loan waiver. (Pls.'s Resp. Ex. D-1, Smith Dep. 15-16; Ex. D-2, Smith Dep. 76; Pls.'s Resp. Ex. E-1, Smith Dep. in *Nemier* at 20-21; Pls.'s Resp. Ex. E-2, Smith Dep. in *Nemier* at 61-62.) Ms. Smith discussed her concerns with her direct supervisor, indicating that she thought there should be additional disclosures "about the growth rates that it took to achieve waiver." (Pls.'s Resp. Ex. E-1, Smith Dep. in *Nemier* at 21.) "Nationwide has stretch goals, and my concern for the agents was that they have to understand what it takes to meet a CAP waiver requirement, that there is substantial growth. And I wanted to make sure that the consultants were helping the agents, even though it's not the consultant's role to tell the agents whether to take a CAP loan or not, but to make sure that they're understanding the economic conditions." (*Id*. at 26.) Management responded by preparing a "CAP Loan Guideline Sheet" outlining how a CAP Loan is calculated and distributed this to all agents and sales people. (*Id*.) Ms. Smith testified that business consultants no longer participate in the preparation of pro formas in connection with CAP Loans, and agents now prepare their own projections for purposes of obtaining a CAP Loan. (Pls.'s Resp. Ex. D-2 at 50-53, 76.)

## II.  STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b).

Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323; *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or

denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must

set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

The rule requires the non-moving party to introduce "evidence of evidentiary quality"

demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135,

145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce

more than a scintilla of evidence to survive summary judgment).

## III.   ANALYSIS

### A.   Plaintiffs Have Failed to Establish a Genuine Issue of Material Fact on Their Claims Based Upon Fraud in the Inducement and Silent Fraud (Counts I and II)

#### 1.   Fraud in the inducement.

Plaintiff claims that the two variables which affected his ability to achieve loan waiver were

the growth of direct written premium and state target growth rates, that these variables were

completely under Nationwide's control and that Nationwide intentionally manipulated these

numbers and failed to disclose their true nature to Plaintiff, all in a fraudulent effort to induce

Plaintiff into the loans and then to leverage his failure to Nationwide's benefit.  (Pls.'s Resp. 10.)

The Court concludes that, viewing all facts in the light most favorable to the Plaintiff, Plaintiff has

failed to produce evidence in support of this claim which creates a genuine issue of material fact

sufficient to survive summary judgment on his claim of fraud in the inducement.

The elements which must be proven to establish actionable fraud or misrepresentation in

Michigan are well established:

> The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he

> thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery. . . . The burden of proof rests with plaintiffs. Fraud will not be presumed but must be proven by clear, satisfactory and convincing evidence.

*Hi-Way Motor Co. v. Int'l Harvester Co*., 398 Mich. 330, 336 (1976) (internal quotation marks and citations omitted).

Plaintiff argues that Nationwide's premium price increases made it impossible for him to achieve the projected growth in direct premium stated in his pro formas and therefore made it impossible for him to meet the state growth targets for loan waiver. Plaintiff asserts that despite Nationwide's increasing premium price, and the impossibility that this presented for Plaintiff to achieve his loan waiver requirements, Nationwide continued to push him to grow and expand and to take out more loans to do so.

Plaintiff admits that he read and understood, on three different occasions over an extended period of time, the following contractual provision which at all times governed the parties' relationship:

> [I] t is understood and agreed that each Company will prescribe rules, regulations, prices, and terms under which it will insure risks, and each Company retains the right to change, alter or amend such rules, regulations, prices, and terms, including the right to limit, restrict, or discontinue entirely the acceptance or writing of any policies, coverages, lines or kinds of insurance, at any time it deems it advisable to do so, and without notice to or consent of the Agent.

(Def.'s Mot. Ex. 1, Bye Dep. 103; Def.'s Mot. Ex. 3, Charles Bye's Agents Agreement dated June 29, 1998, p. 5; Def.'s Mot. Ex. 4, Charles Bye's Independent Contractor Agreement executed May 2, 2002, Ex. 4, p. 8; Def.'s Mot. Ex. 5, Charles Bye's Corporate Agency Agreement, dated October

23, 2002 p. 10.)[7]

In his Second Amended Complaint ("Compl."), Plaintiff alleges generally that Nationwide made representations to him regarding what he could expect from the business opportunity of managing a Nationwide agency and represented to him that it had a business model that would be profitable and provide Plaintiff with a livelihood. (Compl. ¶¶ 8, 11.)  Specifically, Plaintiff alleged (a) that Nationwide represented that the business plan and pro formas for his Nationwide agency would be mutually devised by the parties, (b) that the business consultant would be independent and (c) that the plan they devised would result in a successful business model.  (Compl. ¶¶ 11, 16.) Plaintiff also alleged that Nationwide represented to him (d) that he could increase his success and profitability if he expanded his business by undertaking mergers and acquisitions.  (Compl. ¶ 39.)

Taking each of these alleged misrepresentations in turn, the Court must find an actionable

---

[7]  Nationwide argues that this contractual provision bars Plaintiff from challenging any of Nationwide's business decisions, including its decision to increase premium rates which is the conduct that is at the heart of Plaintiff's claims, through parol evidence tending to prove that the parties actually agreed otherwise. "Parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous. . . . [T]he parol evidence rule addresses the fact that disappointed parties will have a great incentive to describe circumstances in ways that escape the explicit terms of their contracts." *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 228 Mich.  App. 486, 492 (1998) (internal quotation marks and citations omitted).  Plaintiff's contracts with Nationwide contained integration clauses, indicating that the written agreements represented the entire understanding between the parties, providing that any prior agreements or understandings were merged into these final agreements.  While "[p]arol evidence is generally admissible to demonstrate fraud . . . in the context of an integration clause, which releases all antecedent claims, only certain types of fraud would vitiate the contract."  *Id*. at 503 (citations omitted).  Such claims of fraud with regard to a contract that contains an express merger clause must relate to the contract as a whole or fraud that relates expressly to the merger clause itself.  Here, Plaintiff does not challenge or even discuss the integration clause itself.  Even assuming, without deciding, that Plaintiff's wide-ranging claims of fraud go to the entire contract making parol evidence admissible, Plaintiff has failed to produce evidence sufficient to create a genuine issue of fact on his fraudulent inducement claim.

representation, that was false and known to be false when made, that Nationwide intended that it be relied on and that Plaintiff reasonably did rely on it. As to each alleged misrepresentation, which must be established with a reasonable degree of certainty, the failure of any one of these elements defeats Plaintiff's claim.

      **a.    The alleged representation that the business plan and pro forma would be mutually devised.**

This statement, even if made, was true and Plaintiff admitted as much in his deposition and in his responsive brief. The pro forma indicates on its face as follows: "With your cooperation your business advisor has developed this plan." (Pls.'s Resp. Ex. 1.) And in fact, this is precisely what occurred. Plaintiff testified that he prepared a significant portion of the narrative of the loan application, indicating that "[y]es, these boxes contain all the verbiage that I wrote," and "I know for a fact that I did the lower segment where it's starting with Care Reviews," and indicating that yes, he filled out the columns for expected results, costs, retention action plans, activity performed, expected results, cost and target completion dates. (Def.'s Mot. Ex. 1, Bye Dep. 136, 138-139.) Plaintiff also testified that he prepared the expense assumptions in the pro forma, indicating that yes, he provided all the numbers relating to his anticipated expenses. (*Id*. at 162-163.) Plaintiff admitted that he was fully aware of the numbers that were being used in the pro forma**.** (*Id*. at 142, 143.)

It is undisputed that when Plaintiff applied for the CAP Loan for the Cambridge agency acquisition, he independently prepared a business plan. (*Id*. at 178-179.) Similarly, for the Holt acquisition, Plaintiff devised the forecasted numbers himself and prepared the supporting spreadsheets**.** (*Id*. at 201-202.) Finally, in his responsive brief, Plaintiff conceded that the pro formas were a collaborative effort. (Pls.'s Resp. 10.)

Any claim of fraudulent misrepresentation based upon this representation must fail where

Plaintiff admits that the loan applications, business plans and pro formas were prepared in conjunction with Nationwide and therefore were "mutually devised."

      **b.**      **The alleged representation that the business consultant would be "independent" and would be "looking out for Plaintiff's best interests."**

Plaintiff states that "he thought Mr. Sheffieck [his business consultant] was his own consultant, looking out for Plaintiff's best interests. The business consultant was represented to be an independent person whose purpose was to assist the agent with business decision-making (viability)." (Pls.'s Resp. 7.) But the testimony cited in support of this "belief" fails to indicated any representation by Nationwide to Plaintiff that the business consultant was Plaintiff's own consultant, looking out for his best interests. In support of this allegation, Plaintiff cites his own deposition testimony where he admitted that he never hired his own consultant to look over his pro formas and indicated his belief that Mr. Sheffieck was his own consultant, looking out for Plaintiff's best interests. (Def.'s Mot. Ex. 1, Bye Dep. 49.)

Plaintiff also cites the testimony of Ms. Smith, who stated that "the consultants were supposed to be independent, third-party consultants." (Pls.'s Resp. Ex. D, Smith Dep. 27.) This is not evidence of a representation to Plaintiff that his consultant would be looking out for his best interests. Finally, Plaintiff cites the testimony of Ms. Smith in the *Nemier* case that she was concerned that the consultants not be controlled by the sales department because it might impact their independence. (Pls.'s Resp. Ex. E, Smith Dep. 10.) Not only is this testimony from an unrelated case, and not placed in any context, but Ms. Smith goes on to testify that while this was her concern, in fact the consultants never were controlled by the sales team. (*Id*.) This testimony simply cannot be construed as a promise to Plaintiff that his business consultant would be looking out solely for Plaintiff's best interests.

Any claim of fraudulent misrepresentation based upon this representation must fail where Plaintiff has produced no evidence that such a representation was ever made to him.

      **c.**      **The alleged representation that the plan devised by Nationwide and Plaintiff would result in a profitable, successful agency and ultimately would enable Plaintiff to achieve waiver of his loans.**

"The agents were told that they would have an expectation of loan waiver if they were successful. . . . [Plaintiff] believed that his business consultant arranged the numbers to put his agency is an advantageous position for loan forgiveness." (Pls.'s Resp. 7.) This is the heart of Plaintiff's claim. He claims that through the CAP Loan program, Nationwide promised him that the growth projections contained in his pro formas and business plans were realistic and that loan waiver therefore would be achievable.[8]

First, it is clear that Plaintiff was not compelled to participate in the CAP Loan program and could have chosen to go his personal bank to secure financing. (Pls.'s Resp. Ex. D-1, Smith Dep. 41.) Plaintiff did choose to participate, however, and claims that he was told that he could expect loan waiver if he was successful in achieving the performance criteria set forth in the business plan and pro forma. In support of this alleged representation, Plaintiff cites, in addition to his own belief that this was the case, the testimony of Ms. Smith which was as follows:

---

[8] Plaintiff also claims that Nationwide told him he would always have a competitive product to sell. (Pls.'s Resp. 3.) In support of this alleged representation, Plaintiff cites the testimony of Mike Whitehead, a former Nationwide sales director. But in fact what Mr. Whitehead said was that an agent could expect to have a competitive product to sell subject to Nationwide's right to make a profit as well. (Pls.'s Resp. Ex. A-1, Whitehead Dep. 45.) This is entirely consistent with the provision contained in every contract or performance agreement that Plaintiff signed which gave Nationwide the right to change its rates, alter its lines or even completely stop writing insurance in a particular state, all without notice to Plaintiff. The presence of this language, which Plaintiff acknowledges having read and understood on three different occasions, also makes any reliance by Plaintiff on an alleged representation that he would always have a competitive product to sell completely unreasonable. *See infra* discussion at pp. 24-26.

Q:     Okay. And an agent would have an expectation that all things being equal, they would have an opportunity for forgiveness if they progressed and sold and were successful.

A:     Correct.

Q:     So it was a realistic goal, it was designed to be or perceived to be a realistic goal that an agent could receive if they were successful.

A:     Correct.

Pls.'s Resp. Ex. D, Smith Dep. 41-42.  Clearly, none of this testimony relates to a promise to Plaintiff either that the goals in his pro forma specifically were achievable or that he would necessarily achieve loan waiver.  Ms. Smith was not Plaintiff's business consultant and is not testifying about any specific representations that were made to Plaintiff.

Moreover, even assuming that someone did tell Plaintiff that his 5-year projected pro forma goals were achievable and would result in loan forgiveness, this would not be an actionable representation because it is a prediction about the future, not a statement about the past or even the present.  It has long been established in Michigan that "an action for fraudulent concealment must be predicated upon a statement relating to a past or an existing fact.  Future promises are contractual and do not constitute fraud."  *Hi-way Motor, supra* 398 Mich. at 336.  A representation that relates to the future (i.e. if you meet your projected performance goals, we will forgive your loan) sounds in contract, not tort:

> Since fraud must relate to facts then existing or which have previously existed, the general rule is that fraud cannot be predicated upon statements promissory in their nature and relating to future actions, nor upon the mere failure to perform a promise, or an agreement to do something at a future time, or to make good subsequent conditions which have been assured.  Nor, it is held, is such nonperformance alone even evidence of fraud.  Reasons given for this rule are that a mere promise to perform an act in the future is not, in a legal sense, a representation, and a failure to perform it does not change its character. Moreover, a representation that something will be done in the future, or a promise to do it, from its nature cannot be true or false

21

> at the time it was made.  The failure to make it good is merely a breach of contract,
> which must be enforced by an action on the contract, if at all.

*Cook v. Little Caesar Enter., Inc.*, 972 F. Supp. 400, 410 (E.D. Mich. 1997).  A statement that, at the time it is made, cannot be said "from its nature" to be true or false cannot be the basis for a claim in fraud.  In *Little Caesar*, the court found that defendant's real estate manager's statements regarding whether certain independent franchises were in competition with in-store franchises were not actionable to the extent that they related to future competition.  However, the court concluded that such statements that related to competition between independent and in-store franchises in the then-existing market were actionable.  *Id*. at 549, 551.

In addition to his own testimony and the testimony of Ms. Smith, Plaintiff in the instant case, in support of his claim that Nationwide promised him loan forgiveness, cites a statement from the Cambridge Business Plan: "It is our strong mutual desire that by following this plan, it will help you profitably grow your agency."  (Pls.'s Resp. at 9.)  Plaintiff does not quote the next two sentences which state: "However, it is important for you to recognize that the implementation of this plan is entirely optional and solely your responsibility.  Nationwide cannot and does not guarantee the plan as outlined will result in achieving the desired objective."  (Pls.'s Resp. Ex. I.)  Plaintiff does not allege, or provide evidence of, any representations relating to a current, existing or past fact.  Not only did the "promise" relate to future conduct, but it also contained a glaring disclaimer.

Plaintiff correctly observes, however, that Michigan courts have recognized exceptions to this general rule.  Michigan courts recognize fraudulent inducement to enter into a contract when "a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D. Begola v. Wild Bros*., 210

Mich. App. 636, 639 (1995).[9]  Under this exception, "one can be held liable for broken promises

when one has, at the time of the promise, a then-existing bad faith intent to break the promise."

*Diamond Computer Systems, Inc. v. SBC Communications, Inc*., 424 F. Supp. 2d 970, 981 (E.D.

Mich. 2006) (citing *Thompson v. Paasche,* 950 F.2d 306, 312 (6th Cir. 1991) (applying Michigan

law)).  *See also Hi-Way Motor,* supra, 398 Mich. at 337-338;  *Jim Bob, Inc. v. Mehling*, 178 Mich.

App. 71, 90 (1989) (citing *HiWay Motor, supra* at 337-339).  "A Michigan court will apply this

'false token' exception when 'the facts of the case compel an inference that the promise was but a

device to perpetrate a fraud' and the promise was made 'without intention of performance.'"

*Diamond Computer*, 424 F. Supp. 2d at 981 (citing *HiWay Motor, supra* and *Rutan v. Straehly,* 289

Mich. 341 (1939)).  "To fall within this 'bad faith' exception, the evidence of fraudulent intent must

relate to conduct by the actor at the time the representations are made or almost immediately

thereafter."  *Jim-Bob, supra* at 90.

Plaintiff has not presented any evidence that at the time Plaintiff signed his performance

agreements for his CAP Loans, Nationwide intended not to forgive Plaintiff's loan if he achieved

the goals set forth in the performance agreements.  Ms. Smith testified that Nationwide had great

---

[9] In *Evens-McCarthy v. Nationwide Mutual Ins. Co.,* No. 08-CV-12049 (E.D. Mich.), a similar but
factually distinct case involving another Nationwide agent, the court concluded that plaintiff's
fraudulent inducement claim should be dismissed for the separate and independent reason that "fraud
in the inducement is a defense to a contract claim and cannot serve as an independent basis for
awarding plaintiff relief."  (Opinion and Order Granting Motion to Dismiss, Dkt. No. 11, n. 2)
(quoting *Spooner Constr., Inc. v. Jackson*, No. 274930, 2008 WL 142420 (Mich. Ct. App. Jan 15,
2008) (unpublished)).  However, this Court concludes that this holding is at odds with the more
generally accepted rule that "fraud in the inducement renders a contract voidable at the option of the
defrauded party or authorizes damages flowing from reasonable reliance." *Chesterfield Exchange,
LLC v. Sportsmans Warehouse*, 572 F. Supp. 2d 856, 865 (E.D. Mich. 2008).  *See also Nowicki v.
Podgorski*, 359 Mich. 18, 24-25 (1960) (general rule is that party defrauded in making a contract
who discovers the fraud after partial performance can sue for damages).  The Court, therefore,
declines to adopt this alternate basis for dismissal of Plaintiff's fraudulent inducement claim.

plans for its loan forgiveness program, that it was anticipating growth and increased sales in the state but that the CAP Loan program hit Michigan at a time when the Michigan economy was going down and that the success of the CAP Loan program correlated with the growth (or decline) in the insurance industry as a whole. (Pl.s Resp. Ex. D-2 at 42, 46.) Despite Plaintiff's counsel's efforts at the deposition to elicit a different response, Ms. Smith never testified that any Nationwide employee misrepresented the CAP Loan program, only that they were "misinformed." Plaintiff at the summary judgment stage is required to produce "evidence of evidentiary quality" demonstrating the existence of a genuine issue of material fact. Plaintiff has not come forward with any evidence of a bad faith intent on the part of Nationwide, at the time of Plaintiff's CAP Loan agreements were executed, not to forgive Plaintiff's loan if Plaintiff met his waiver requirements. In fact, several agents did achieve waiver and their loans were forgiven. (Pls.'s Resp. Ex. F, Deposition of Karen Marszalec, June 12, 2009, 25-26.)

Viewing the facts in the light most favorable to the Plaintiff, however, Plaintiff appears to make a somewhat different argument. Plaintiff doesn't actually claim that Nationwide intended to break its promise of loan forgiveness if the agent met its performance goals. Plaintiff isn't claiming that he reached his performance goals and Nationwide failed to forgive his loans - a broken promise as to future conduct. Rather, Plaintiff appears to argue that Nationwide knew that the goals set forth in the performance agreements were unachievable and that therefore Nationwide knew that it would never be called upon to fulfill this promise – in essence that Nationwide intentionally misrepresented the likely success of Plaintiff's agency for some ulterior motive. But this is not a misrepresentation regarding future *conduct* and this theory stretches the limits of the "bad faith" exception.

Additionally, the integrity of the theory is belied by Plaintiff's own testimony.[10] When asked what he understood the pro forma to be, he stated that he thought it was "an estimate of earnings and expenses." (*Id*. at 167.) "Q: You don't understand it to be a guarantee that the numbers reflected in the Pro Forma – A: No, I don't expect the – Q: Let me finish the question so the court reporter can get it down. A: I'm sorry. Q: That it's not a guarantee of the numbers reflected in the pro forma? A: I understand that it's not a guarantee, but I would expect that it would be somewhat close or accurate because I was basing decisions on the information that Nationwide was providing me." (*Id*. at 167.) As we have seen, however, much of the information was in fact provided by Plaintiff himself.

Even assuming that Plaintiff has created a genuine issue of fact on this issue, and that Nationwide did misrepresent to Plaintiff that he could hit his performance targets and achieve loan forgiveness, Plaintiff's fraud claim is ultimately foreclosed by the fact that any reliance by Plaintiff on such representations made by Nationwide was unreasonable. For Plaintiff to succeed on his fraud claim he must prove that he reasonably relied on any alleged misrepresentation. *Zaremba Equip. Inc. v. Harco Nat'l Ins. Co*., 280 Mich. App. 16, 39 (2000) ("This Court has frequently reiterated that, to sustain a fraud claim, the party claiming fraud must reasonably rely on the material

---

[10]  In *Evens-McCarthy, supra,* the court reached this same conclusion and granted Nationwide's motion to dismiss plaintiff's complaint, finding that "the defendant's alleged misrepresentations regarding 'its business strategies and the business opportunity . . . the book of business valuations and the data, estimates and/or assumptions in the pro formas and business plans'" were not actionable on a theory of fraudulent inducement because they did not relate to future *conduct*. (No. 08-CV-12049, Dkt. No. 11, Opinion and Order Granting Defendant's Motion to Dismiss, p. 5.) "Plaintiff does not allege that defendant misrepresented its future *conduct*, but rather that defendant misrepresented, in essence, the likely success of plaintiff's agency, based on inaccurate "data, estimates and assumptions" that formed the basis of the business plan for the agency. "These allegations do not state a 'claim' for fraudulent inducement." (*Id.*) (emphasis added).

misrepresentation.") Of particular significance in this case, it is well accepted that "[c]hanges in markets and economic conditions occur frequently, and one cannot reasonably expect an office, plant, or store that becomes not viable economically and not in the strategic interests of its owners to remain open." *Rooyakker & Sitz, P.L.L.C. v. Plante & Moran, P.L.L.C.*, 276 Mich. App. 146, 162 (2007) (rejecting plaintiff's claim that defendants did everything to undermine the success of plaintiff's office while at the same time representing to plaintiff that the office would remain open). Plaintiff has presented no evidence that Nationwide hid anything from him regarding the growth targets set forth in his performance agreements and Plaintiff was in as good a position as Nationwide to evaluate their reasonableness. Therefore any reliance on an alleged promise by Nationwide that those goals were achievable was unreasonable.

Plaintiff's reliance on any alleged representation that his performance goals could be reached and loan forgiveness achieved was objectively unreasonable because he knew all of the facts necessary to predict the fatal outcome. He knew that Nationwide had begun to increase its rates in 2003 and was fully aware when he took out his 2003 CAP Loan that Nationwide expected to take more double digit increases in both homeowners and auto lines (Plaintiff's bread and butter) over the next 3-5 years. (Def.'s Mot. Ex. 1, Bye Dep. 149-152.) Plaintiff's own plan assumed a 22% rate increase and Plaintiff glosses over this fact off by stating that it was "only an assumption" and he "didn't really expect to see it go up 22 percent." (*Id*. at 150-152.) By 2006, when Plaintiff decided to acquire the Holt agency (another "failing" agency, like Cambridge), Plaintiff knew that Nationwide had passed on large rate increases for the past several years and was tightening its underwriting standards. (*Id*. at 135-136.) Plaintiff admitted that the 2003 pro forma showed that after 5 years, he still wouldn't be making money. (*Id*. at 166.) But Plaintiff explained this away by

stating that he hoped to make up the shortfall with the acquisition of Cambridge. (*Id.*) Plaintiff's reliance claim simply is unreasonable.

Plaintiff correctly asserts that Michigan courts have "long recognized that the relationship between the parties is crucial in determining whether fraud has occurred." *In re Allied Supermarkets, Inc.*, 951 F.2d 718, 725 (6th Cir. 1992) (citing *Hayes Constr. Co. v. Silverthorn*, 343 Mich. 421, 426-427 (1955)). "One party may have special knowledge and the other none and without the means of getting it. In this case the latter cannot fairly and reasonably exercise his own judgment. The parties, therefore, do not stand on equal terms and the buyer has a right to rely upon the representations of excellence." *Hayes, supra* at 426-427. Plaintiff relies on *Allied* to support his claim that his case fits within the exception described in *Hayes. Allied* is easily distinguished. Plaintiffs in *Allied* were Iraqi immigrants whom the court found were without the means to discover the alleged misrepresentation. The court also found that defendant actively discouraged plaintiffs from making the calculations necessary to discover defendant's fraud:

> In this case, however, Allied told the Semaans that it had special expertise in the grocery business and, if plaintiffs followed the Allied system, they would profit. Thus, even if Allied provided the Semaans with the means to discover their gross profits after paying all of the fees, Allied circumscribed the Semaans' use of that information by discouraging them from making any calculations. Allied is a sophisticated business with special knowledge in the grocery business; the Semaans are Iraqi/Chaldean immigrants. These parties did not stand on equal terms, and it was natural for the Semaans to rely on Allied's representations concerning the gross profit figures. Therefore, the fact that Allied actually provided the Semaans with sufficient information to discover their gross profits after including the additional costs is not a legal bar to the Semaans' claim of fraud.

951 F.2d at 725. Plaintiff in the instant case, an insurance agent for several years before taking his first CAP Loan, and a sophisticated businessman in other endeavors prior to that, cannot claim to be similarly situated. Nor has he produced evidence that Nationwide actively discouraged him from

independently examining the reasonableness of his loan waiver goals.

Finally, as to each of the alleged misrepresentations, Plaintiff has failed to adduce evidence that Nationwide, even assuming it made all of the alleged statements, did so with the intent to deceive him. The closest Plaintiff comes to succeeding on this claim is his mischaracterization of Ms. Smith's testimony that the business consultants were misinformed about the CAP Loan program. However, when asked whether he thought that Mr. Sheffieck, his business consultant, manipulated the numbers in his pro forma so that Plaintiff would fail, Plaintiff responded that he would hope Mr. Sheffieck wouldn't do that but "quite honestly [he didn't] know." (Def.'s Mot. Ex. 1, 168.) With this testimony, Plaintiff conceded the element of intent. Plaintiff cannot build a fraud claim, which requires proof of specific intent to deceive, when he cannot even say himself that he believed Nationwide intended to deceive him.

While Plaintiff refers repeatedly to Nationwide's "scheme," Plaintiff proffers no evidence that this alleged scheme was anything other than an honestly-arrived at bad business decision. Plaintiff testified that "the biggest problem that I had with Nationwide was that, you know, Nationwide doesn't understand that price is what sells insurance. I mean that's why Geico is the fastest growing company out there right now because price is what drives insurance. . . . and that's where Nationwide is way off base because they would say well, you guys just need to work on your selling skills. There's no working on selling skills over $400 in difference every six months, and that was not uncommon for it to be that much different. They priced us so far out of the market that we couldn't sell any product, and we couldn't hold on to what we had." (Def.'s Mot. Ex. 1, Bye Dep. 41.) Plaintiff himself admits that Nationwide "didn't get it" and made a bad business decision by increasing their premium rates. What Plaintiff has not established is that Nationwide knew that the

model was bad and forced it on Plaintiff, hoping he would fail, all for Nationwide's own benefit. Plaintiff claims that Nationwide had a hidden scheme to push agents out of Michigan and cut back to "five or six super agencies." (Def.'s Mot. Ex. 1, Bye Dep. 12.) Even if this happened, it surely wasn't hidden from Plaintiff who testified that he wanted to be one of those super agencies himself! (*Id*. at 20, 24.)

Plaintiff has not offered one iota of evidence that Nationwide "leverage[d] the agent's own investment of time and money in the business" to expand market share. (Pls.'s Resp. 5.) Plaintiff provides no evidence that Nationwide believed such a "scheme" – having failing agencies all over the State of Michigan – would be a good business decision. Plaintiff offers no evidence to support the allegation that Nationwide set its agents up to fail. There is no question that the numbers in the pro forma were projections and assumptions and that Plaintiff agreed that the results forecasted appeared, at the time they were made, to be achievable. (Def.'s Mot. Ex. 1, Bye Dep. 143, 149, 154; Pls.'s Resp. Ex. C, Sheffieck Dep. 22-24.) While Plaintiff claims that the state growth targets placed in the pro formas by Nationwide were unrealistic, and that the premium rate increases forced on the agents made these targets unattainable, Plaintiff does not claim that these figures were ever hidden from him. While Nationwide may have set its goals too high for Michigan, and failed to achieve its hoped-for growth in this market, Plaintiff has not produced evidence that this was done with the specific intent to defraud Plaintiff.

### d. The alleged representation that Plaintiff would be successful if he followed the model for growth set out in his pro formas.

Plaintiff alleges that Nationwide "constantly pushed its agents to grow," and told Plaintiff that if he grew his agency as outlined in this pro formas, he would be successful and would achieve loan waiver. (Pls.'s Resp. 4.) This is but a variation on the alleged representation that if Plaintiff

followed the pro forma, he would achieve loan forgiveness – a "promise" based on assumptions and predictions about what might happen in the future. Moreover, it is undisputed that Nationwide never forced Plaintiff to undertake an acquisition or an expansion and Plaintiff understood that any new acquisition had to make financial sense for his own business:

> Q: Okay. With rates continuing to rise and with the debt load that you had, why did you want to borrow more money to keep expanding?
>
> A: Because growth was king with Nationwide. They wanted us to still expand and grow. I had Bryan Van Epps pushing me also to take over the Holt office, and growth was king, at least that's what I thought at the time. And that agency was providing positive cash flow.
>
> Q: But did anybody tell you, look, if you don't take over the Holt Agency, we're going to terminate you?
>
> A: No, they did not say that, but it was always said that to stay in their good graces, you know, you've got to grow, you've got to look at expansion, you've got to look at hiring commercial producers. I mean I did everything they ever asked of me.
>
> Q: But isn't it true that it always had to make sense for your business?
>
> A: Absolutely. And financially it did make sense because the Holt acquisition provided positive cash flow.

(Def.'s Mot. Ex. 1, Bye Dep. 195-196.) Plaintiff perceived that "growth was king" but does not identify one statement of a Nationwide employee who forced Plaintiff to take out a CAP Loan for growth. Plaintiff admits that these decisions whether to expand were always in the end his own, and he was always given a six-month "free look" so that he could evaluate the book of business before making a final commitment. He never opted to back away. He repeatedly invested in locations where previous agents had failed because he thought he was "different than those other guys." Plaintiff believes that Nationwide "should have come to us and said you guys need to start bringing in all your overhead, lower your expenses because we're going to have a rough couple of years, but

no, they never said that. Instead, they kept pushing us to open up satellites, hire producers, and spend money. And in essence, they leveraged people." (*Id*. at 74-75.) But Plaintiff, an experienced Nationwide agent with years of experience, provides the Court with no basis to conclude that Nationwide had any obligation to make Plaintiff's business decisions for him. Plaintiff acknowledges that any decision that he made to grow had to make sense for his business and that he believed that he could make it work.

e. **Plaintiff has not provided enough evidence to create a genuine issue of fact on the issue of whether the alleged misrepresentations based on the pro formas constitute actionable fraud.**

In two of the other two cases involving similar but factually distinct fraud claims against Nationwide filed in this District, motions to dismiss were denied because the courts could not conclude, based solely on the pleadings, that none of the exceptions to the future promise rule applied. *See Boeve v. Nationwide Mutual Ins. Co.*, No. 08-CV-12213, 2008 WL 3915011 at * 4 (E.D. Mich. Aug. 20, 2008) (concluding that the court could not determine as a matter of law whether Nationwide's misrepresentations in pro formas and business plans constitute actionable bad faith projections of profitability); *Bucciarelli v. Nationwide Mutual Ins. Co.,* 662 F. Supp. 2d 809, 816 (E.D. Mich. 2009) (concluding that there was "simply not enough information before the Court for it to rule as a matter of law that the representations in the pro forma were solely related to future promises, as opposed to representations about existing facts," particularly where the parties were not in agreement about who drafted the pro forma and the relationship between the parties and their relative access to information could not be determined).

Unlike the courts in *Boeve* and *Bucciarelli*, this Court has the benefit of a fully developed summary judgment record that establishes that this Plaintiff did participate in the preparation of his

pro formas and business plans and that he did not stand in a position of inequality relative to Nationwide, such that any statements in the pro formas can be deemed to be actionable misrepresentations. Even drawing all inferences in Plaintiff's favor, Plaintiff simply has not adduced enough evidence demonstrating facts that could lead a reasonable jury to conclude that Nationwide fraudulently induced this Plaintiff into continuing to invest in and grow and expand his Nationwide agency.

### 2.      Silent Fraud - Competition from Allied

Plaintiff claims that Nationwide competes with its own agents by selling insurance under its Allied banner at rates that are lower than the rates it allows its captive agents to charge and that this contributed to his failure to achieve loan waiver. Plaintiff claims that Nationwide failed to disclose that "it has the ability and does in fact manipulate the prices so as to affect the percentage of insurance written by captive agents as compared to independent Allied agents." (Compl. ¶¶ 34, 35.) "Plaintiffs allege that Nationwide had a duty to tell Mr. Bye that it was competing against them and selling the same products for a cheaper price through another division of Nationwide." (Pls.'s Resp. 15.) Plaintiff relies on *M&D, Inc. v. W.B. McConkey*, 231 Mich. App. 22 (1998) for the proposition that silence accompanied by deceptive conduct or suppression of material facts can give rise to concealment that is actionable as fraud. (Pls.'s Resp. 15.) In order to be actionable, silent fraud requires Plaintiff to demonstrate (1) that he expressed concern over or otherwise inquired into a matter and was given an incomplete reply or "misdirection" on which Plaintiff relied or (2) that Nationwide made a representation but acquired subsequent information which rendered a previous representation untrue. *Id*. at 38.

Plaintiff's allegations as to the Allied issue do not even state a claim of silent fraud because

Plaintiff did inquire and Nationwide gave Plaintiff a full and truthful reply - yes Allied does compete

with you and you just need to live with it:

> Q:     When did you first notice you were competing against [Allied]?
>
> A:     You know, time frames I'm not positive of, but 2003, 2004, somewhere around there it seems like, and I'm guessing at that.
>
>            *         *         *
>
> A:     Yep. And it would be, you know, it's Allied with a Nationwide logo, and they were just mowing us right out of the water. So essentially we were competing against our own company.
>
>            *         *         *
>
> Q:     Did you complain at the time about it?
>
> A:     Yeah, we talked to Nationwide about it. We said, you know, what is this, we're competing against our own company, and then they're considerably lower, sometimes 30, 40 percent lower, and we were basically told hey, that's just the way it is.
>
> Q:     So you were aware of Allied prior to, for example, your acquiring the Cambridge Agency?
>
> A:     Yes, I was.
>
> Q:     And you were aware of it prior to your acquiring the Holt agency?
>
> A:     Yes, I was.
>
> Q:     And you had already complained about Allied before you had bought the Cambridge Agency.
>
> A:     Yes.
>
>            *         *         *
>
> Q:     Do you believe Nationwide ever lied to you or concealed something from you about Allied operating in Michigan?
>
>            *         *         *
>
> A:     No, it wasn't concealed at that time but, you know, they didn't add the

> Nationwide frame to it, and that's when, you know, I started having a problem with it.

(Def.'s Mot. Ex. 1, Bye Dep. 62-64.)  Plaintiff did inquire, and he did receive a full and truthful response and he doesn't claim otherwise.  He just didn't like the response.  This does not state a claim of silent fraud.

Moreover, Plaintiff has not produced any evidence to support the claim that the Allied product was in fact always, or even generally, priced lower than the comparable Nationwide product or that Nationwide intentionally manipulated those prices.  In support of his assertion that "Nationwide competed with its own agents, making up lost volume by selling Allied for less" (Pls.'s Resp. 6), Plaintiff refers to his own deposition testimony and then blatantly mischaracterizes the testimony of other witnesses. Plaintiff cites the testimony of Mr. Whitehead, who stated that he couldn't say what the Allied price was compared to the Nationwide price because he just didn't know.  (Pls.'s Resp. Ex. A-1, Whitehead Dep. 41.)  Plaintiff also cites to the testimony of Mr. Sheffieck who was responding to a hypothetical and gave no testimony whatsoever as to what Nationwide actually did with the price of its insurance relative to the Allied product.  Plaintiff's silent fraud allegation is based on pure conjecture without any evidentiary support and fails even to state a claim of silent fraud, let alone create a genuine issue of material fact that would survive summary judgment.

**B.      Plaintiff Has Failed to Create a Genuine Issue of Material Fact on His Claim Based Upon the Michigan Franchise Investment Law (Count II)**

Plaintiff claims that Nationwide violated the Michigan Franchise Investment Law ("MFIL"), MCL 445.1501 *et seq.*, by employing devices, schemes and artifices to defraud in its sale or offer of a franchise.  (Compl. ¶ 57.)  Under MCL 445.1502(3), a "franchise" is defined as "a contract or

34

agreement, either express or implied, whether oral or written, between 2 or more persons to which

all of the following apply: (a) A franchisee is granted the right to engage in the business of offering,

selling, or distributing goods or services under a marketing plan or system prescribed in substantial

part by a franchisor; (b) A franchisee is granted the right to engage in the business of offering,

selling, or distributing goods or services substantially associated with the franchisor's trademark,

service mark, trade name, logotype, advertising, or other commercial symbol designating the

franchisor or its affiliate; (c) The franchisee is required to pay, directly or indirectly, a franchise fee.

All three elements must be present in order for a relationship to be governed by the MFIL.

Nationwide claims (1) that the relationship between an insurer and its agent is governed

exclusively by the Michigan Insurance Code and therefore the MFIL does not govern the

relationship between Nationwide and Plaintiff; (2) that Plaintiff is not permitted to offer or sell

insurance; and (3) Plaintiff did not pay, and was not required to pay, a franchise fee.

In support of its argument that Plaintiff is not permitted to "sell" insurance, Nationwide relies

on *Harts v. Farmers Ins. Exch.*, 461 Mich. 1, 8-9 (1999) where the court held that insurance agents

are merely "order takers" and are not obligated to advise prospective purchasers regarding the

adequacy of coverage, a role intended to be fulfilled by insurance counselors. *Id*. at 9. Nationwide

argues that because an agent is merely an order taker, they cannot bind the insurance company and

therefore cannot engage in the business of "offering or selling" insurance, a prerequisite for

application of the MFIL. (Def.'s Mot. 18.) Nationwide refers the Court to the Illinois case of

*Vitkauskas v. State Farm Mut. Auto Ins. Co.*, 509 N.E.2d 1385, 1391 (Ill. App. 1987) where the

Illinois court interpreted an identical statutory provision as inapplicable to an insurance agent

because the agent could only solicit applications for insurance but could not sell the product and

could not bind the principal. *Id.* at 1391. However, as the court observed in analyzing this same argument in *Bucciarelli, supra*, the Illinois court's reasoning ignores the language of the statute that refers to the "offering" of insurance as well as the "selling" of insurance, noting that the former would be entirely redundant if it were taken to be synonymous with selling. *Bucciarelli*, *supra* at 818. The court in *Bucciarelli* concluded that the term "offering" as used in the MFIL must be construed more broadly than "selling" and does encompass the solicitation of orders for insurance coverage. However, this Court need not decide whether "taking orders" would be considered the equivalent of "offering" insurance, or whether the MFIL is generally applicable to the relationship between an insurance company and its agents, because it finds that Plaintiff has not alleged facts that establish that he paid a "franchise fee" as that term is understood in the cases interpreting the MFIL.[11] *See also Boeve, supra* at * 14-18 (finding insufficient allegations of a franchise fee consistent with the reasoning of *Hamade*); *Evens-McCarthy*, *supra*, Slip Op. at 6 (finding the MFIL inapplicable based on defendant's unopposed argument that the MFIL does not apply to the insurance industry).

Under MCL 445.1503(1), a "franchise fee" is defined as "a fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business under a franchise agreement, including but not limited to payments for goods and services." Was Plaintiff required to or did he agree to pay a fee or charge to Nationwide for the "right to enter into a business under a franchise agreement?" Plaintiff articulates the following theory in support of his argument that he paid a franchise fee: "Plaintiffs contend that Defendant churns agents. When the agent fails,

---

[11] The Court does note, however, that Nationwide cites a comprehensive list of well-reasoned cases from other jurisdictions that find both that the franchise acts do not apply to the insurance industry and that insurance agents are not empowered to offer or sell insurance. (Def.'s Mot. 16 n. 89.)

which, according to Plaintiffs' theory, he or she is going to do, Nationwide takes the enhanced book of business, sells it for more than it credits the defaulted former agent and then makes more money off the same book with the new agent. The fee is the profit from the book obtained by Nationwide." (Pls.'s Resp. 18.) Although the logic of this alleged business theory escapes the Court, it is clear that the "profit" occurs, if at all, after the agent has been "churned" and therefore cannot possibly be paid for the right to *enter into* the agreement, which of necessity would have to be paid at the inception of the agreement. "Because the MFIL seeks to protect prospective franchisees by imposing various requirements on the franchisor in connection with the offer and sale of a franchise, *see* MCL 445.1504(1), whether a contract or agreement constitutes a franchise for purposes of the MFIL must be determined from the circumstances present at the time of the offer or sale. Subsequent market developments cannot transform an agreement that was not subject to the MFIL at its inception into a franchise subject to the requirements imposed by the MFIL." *Hamade v. Sunoco, Inc. R & M,* 271 Mich. App.145, 159 (2006*).* Because Plaintiff has not provided evidence that he paid a franchise fee, the Court concludes that the MFIL is not applicable to Plaintiff's claims against Nationwide. The Nationwide agency agreements themselves do not speak to a fee and Plaintiff was not obligated to participate in the CAP Loan program as a condition to becoming a Nationwide agent. *See Bucciarelli, supra* 662 F. Supp. 2d at 819.[12] In fact Plaintiff was free to use whatever means he chose to finance his acquisitions and expansions, in which case such "profit" would presumably

---

[12] The court in *Bucciarelli* denied Nationwide's motion for summary judgment on the MIFL claim, however, because plaintiff there claimed to have been obligated to purchase certain supplies and office equipment as a "franchise fee." While the purchase of such goods is not considered a franchise fee where the goods are purchased at a bona fide wholesale price (*see Hamade, supra* at 145), Judge Murphy was unable to conclude on the basis of the pleadings that Plaintiff paid a bona fide wholesale price. (*Bucciarelli, supra,* 662 F. Supp. 2d at 820.) Plaintiff makes no such claim here.

never be realized. Plaintiff has not alleged facts sufficient to create a genuine issue of material fact in support of his claim that he was required to pay a franchise fee consistent within the reasoning set forth in *Hamade*. Nationwide is entitled to summary judgment on Plaintiff's MFIL claim.

**C.    Nationwide in Entitled to Summary Judgment on Count IV of Plaintiffs' Complaint**

In Count IV, Plaintiff claims that "Nationwide has breached its contractual duty by attempting to obstruct Charles L. Bye, Jr. and his agency from competing. Nationwide continues to breach the Agency Agreement by filing its Counter-Claim against him and his agency on the basis of its non-compete clause." (Compl. ¶¶ 82, 83.) Nationwide argues that this claim makes no legal sense. Plaintiff failed to respond to this argument either in its brief or at oral argument and has offered no legal support or analysis of this claim of "duty." The Court agrees that this "Count" appears to be an argument offered in defense to Nationwide's counterclaim alleging that Plaintiff violated a contractual non-compete provision, and does not state a legally cognizable claim. Count IV, therefore, is dismissed.

**D.    Nationwide is Entitled to Summary Judgment on Plaintiff's Unjust Enrichment Claim (Count V)**

Nationwide argues that Plaintiff cannot state a claim for unjust enrichment where there is a contract governing the same subject. "Unjust enrichment requires a plaintiff to prove (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Belle Isle Grill Corp. v. Detroit*, 256 Mich. App. 463, 478 (2003). If this is established, the law will imply a contract in order to prevent unjust enrichment. *Id*. However, "a contract will be implied only if there is no express contract covering the same subject matter." *Hudson v. Mathers*, 283 Mich. App. 91, 98 (2009). Plaintiff states in his

response that this principle of law does not apply because "the mechanism to perpetrate this fraud was not part of the agreements." (Pls.'s Resp. 20.) Plaintiff cites no authority to support this proposition and in any event the Court has finds that Plaintiff's fraud claim fails. The Court concludes that Nationwide is entitled to summary judgment on Plaintiff's unjust enrichment claim. *See Bucciarelli, supra* at 820-821 (dismissing unjust enrichment claim where parties' contract covers the same subject matter).

      **E.**      **The Court Will Defer Ruling on Nationwide's Motion for Summary Judgment on Count III of Plaintiff's Complaint Pending the Filing of Supplemental Briefing on That Discrete Claim and Will Hold in Abeyance Its Ruling on Nationwide's Motion for Summary Judgment on Counts I-V of its Counterclaim**

Plaintiff appears to claim in Count III that under the terms of the ICA, Plaintiff was not an "exclusive" representative and therefore his termination was a breach of that agreement because it was based upon a reason not identified in MCL§ 500.1209(2). (Compl . ¶¶ 60-68.) The parties touched on this issue only fleetingly in their briefs and not at all during oral argument, yet the issue remains before the Court. The Court is unable to conclude, based on the scant evidence and legal argument presented by the parties, whether issues of fact remain as to whether MCL § 500.1209 applies to Plaintiff's agreement or whether Plaintiff was an "exclusive" agent for Nationwide as that term is understood for purposes of the application of the exception contained in MCL 500.1209(4). The parties will be given an opportunity to provide the Court with supplemental briefing on these two narrow issues.

Plaintiff argues that alternatively, Nationwide has breached not the ICA but the CA by terminating Plaintiff's agreement. (Compl. ¶¶ 69-71.) In its earlier opinion denying Nationwide's motion to dismiss, this Court noted that there were "issues of fact regarding what contract was in

effect at the time of Defendant's alleged misrepresentation." (Opinion and Order Denying Motion to Dismiss, Dkt. No. 13, 10.) The Court concludes that the record and legal argument presented on this issue remains insufficient to permit the Court to determine which contract was in effect at the time of Plaintiff's termination and whether a genuine issue of material fact exists as to whether Nationwide's termination of Plaintiff violated that agreement. The parties will be given an opportunity to provide the Court with supplemental briefing on these two additional narrow issues.

Because the Court concludes that the parties have presented insufficient evidence to enable the Court to rule on the issues presented in Count III of Plaintiffs' Complaint, it will hold in abeyance its ruling on Nationwide's motion for summary judgment on Counts I-V of its Counterclaim pending resolution of Nationwide's motion for summary judgment on Count III of Plaintiffs' Complaint.

## IV. CONCLUSION

The Court GRANTS Nationwide's motion for summary judgment on Counts I, II, IV and V of Plaintiff's Complaint, and holds in abeyance its ruling on Nationwide's motion for summary judgment on Count III and on Nationwide's motion for summary judgment on Counts I-V of its Counterclaim, pending the parties' submission of supplemental briefing as requested in a separate Order filed this day.

**IT IS SO ORDERED.**

s/Paul D. Borman                
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: August 5, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 5, 2010.

s/Denise Goodine
Case Manager